STATE OF MAINE                                    SUPERIOR COURT
PENOBSCOT, SS.                                    CIVIL ACTION
                                                  Docket No. RE-00-28

FILED & ENTERED
SUPERIOR COURT

MAY 1 5 2002

PENOBSCOT COUNTY

Gary McNally et al.,
      Plaintiffs

        v.                                        Decision and Judgment

James Pocock et al.,
      Defendants

        Hearing in this matter was held on January 10 and 23, 2002.  On both hearing dates, the plaintiffs were present with counsel.  Defendants James Pocock, Mary Pocock, Wilman Pelletier and Judy Pelletier were present with their attorney.  Defendant Carlton Bragg appeared *pro se*.  The United States of America, acting through the Rural Housing Service, was joined as a party defendant but did not appear at trial.  The government's interest arises out of a pending foreclosure action it has initiated against the plaintiffs, who are the mortgagors of the parcel at issue in this case.  Counsel for the remaining parties represented that the government agreed to be bound by the judgment entered in this action.

        The plaintiffs own a parcel of land, on which their residence is situated, in T2 R6.  The eastern side of their property is bounded by Route 11.  Their southern boundary of their property consists of the northern edge of a 36-foot wide right-of-way.  In this action, the parties have litigated where that right-of-way is located on the face of the earth and therefore the location of the plaintiff's southern boundary.  The evidence generates issues of the location of those boundaries based both on various deed descriptions and notions of adverse possession.[1]

---

[1] The plaintiffs never filed a complaint in this action.  Rather, the instrument used as the basis for subsequent proceedings was their motion for temporary restraining order (which motion was granted).  The court raised this issue at an unrecorded preliminary conference of counsel after the matter was scheduled for trial.  The parties agreed that the legal

1

The parcels owned by the parties to this action originated from a common source and was described as lot 5, which was described as 120 acres, more or less, in quantity. *See* plaintiffs' exhibit 1, deed dated January 19, 1899. In 1914, the owner, Herbert Gerald, conveyed a portion of lot 5 to the predecessor in interest of Richard and Barbara Hayes. *See id.*, deed dated June 16, 1914. This represented the first outconveyance from lot 5. The conveyed parcel was triangular in shape. Its area was defined by a 36 rod boundary running along the Medway Road (now Route 11), "thence northwesterly on line of wire fence 36 rods, thence easterly 27 rods to place of <u>beginning</u>. . . ." (Emphasis in original.) Efforts to find the wire fence have been unsuccessful. The deed did not make reference to any other monuments. Notwithstanding the deed's failure to identify any monuments that either exist presently or can be found, it is clear that this triangular shaped lot is the parcel now owned by the Hayes'. The deed description notes that it is the parcel on which the Simon Boone residence was located. The Hayes' now own and live on that same parcel, and the deed they received in 1972 makes reference to the Boone's residence. *See* plaintiffs' exhibit 3.

Herbert Gerald's next transaction regarding lot 5 occurred eight years later, when he granted a right-of-way to Summit Lumber Company. *See* plaintiffs' exhibit 1, deed dated June 13, 1922. The location of the right-of-way was described as follows: ". . .over, upon and along a <u>a</u> [*sic*] certain road or right of way as now laid out and used running west from the Medway Road on the North side of the house lot occupied by Simon Boone in said Township 2, range 6 to the parcel of land purchased by said Summit Lumber Company from Hiram Gerald. Said right of way or easement to be thirty-six feet in width." As is noted above, the Boone residence was located on the triangular parcel that Gerald conveyed to the Hayes' predecessor in interest in 1914. Under the terms of the 1922 instrument, the right of way would therefore run in an east-west orientation from the Medway Road (Route 11) across the interior of lot 5. The 1922 deed from

issues were apparent to them because of the plaintiffs' arguments in their motion for TRO and because of counsel's prior communications regarding the case, and the defendants did not suggest that they would be prejudiced by this omission of pleadings. Therefore, despite the unusual procedural posture of the allegations, the parties went forward with the trial.

Gerald to Summit Lumber did not purport to convey title to the area used as the right-of-way.

In 1945, Gerald conveyed his remaining interest in lot 5 to Orrin Bates. *See* plaintiffs' exhibit 1, deed dated April 10, 1945. This deed specifically excepted the triangular lot that Gerald previously conveyed (now the Hayes lot) and the Summit Lumber right-of-way.

The next outconveyance from the remainder of lot 5 occurred in 1947. This transaction created the parcel that is now owned by the plaintiffs ("the plaintiffs' southern parcel") and that is the focus of this litigation. *See* plaintiff's exhibit 1, deed dated July 1, 1947. The deed description began at the intersection of the edge "of the Medway Road and the north line of the farm road" conveyed in 1922 from Gerald to Summit Lumber.[2] The boundary then ran six rods along the Medway Road, then "westerly parallel to the north line of said farm road a distance of fifteen (15) rods; thence southerly parallel to said Medway Road to the north line of said farm road; thence easterly along said north line to the place of beginning." No other monuments are included in the deed description.

To the extent revealed by the trial record, two conveyances of note occurred subsequent to July 1947. First, a third parcel was created and conveyed out of the original lot 5.[3] This lot, part of which now appears to be owned by Mark and Patsy

_____

[2] The deed actually refers to a deed dated June 13, 1932, from Gerald to Summit Lumber. The reference to 1932, rather than to 1922, is clearly a scrivener's error. The true date of the Gerald-Summit Lumber deed is June 13, 1922, and the 1947 deed that created the parcel now owned by the plaintiffs correctly referred to the book and page where the 1922 deed was recorded.

[3] The deed that created this parcel does not appear to be included in the trial record. Of the deeds submitted into evidence, the parcel is first noted in a deed dated September 11, 1973. *See* plaintiffs' exhibit 2. That deed recites that the grantors acquired their interest in that parcel through an earlier deed recorded at book 2049 page 17. If that latter deed was the first used to convey this parcel, then it postdated the creation of the plaintiff's southern parcel, because the plaintiff's southern parcel was created in a deed that was recorded at book 1262 page 491. If this sequence is correct, then it appears that the plaintiffs' southern parcel was created prior to the creation of the Morrow parcel.

3

Morrow ("the Morrow parcel"),[4] abuts Route 11. The northeast corner of the lot is located on Route 11, 575 feet in a southerly direction from the northeast corner of the original lot 5. From that point, the eastern boundary of the present Morrow lot then runs southerly along Route 11 for a distance of 100 feet, "more or less."

Second, in 1987, a parcel, located between the plaintiff's southern parcel and the Morrow parcel, was created. *See* plaintiffs' exhibit 2, deed dated August 7, 1987. The plaintiffs now own this parcel ("the plaintiffs' northern parcel"), as well as the parcel created by the June 1947 deed. The northeastern corner of the plaintiffs' northern parcel is located on Route 11, 675 feet south of the northeast corner of original lot 5. In other words, the northeast corner of the plaintiff's northern parcel adjoins the southeast corner of the Morrow parcel. The northern boundary of the plaintiff's northern parcel then runs for 102 feet in a westerly direction along the southern boundary of the Morrow property. Then, according to the deed description, the boundary runs for 236 feet in a direction (generally southerly) that is parallel to Route 11. In reality, that western boundary – as measured between the Morrow parcel and the plaintiffs' southern parcel, both of which predated the plaintiffs' northern parcel – is 224 feet long. From the southwestern corner of the plaintiffs' northern parcel, its southern boundary runs 102 feet back to Route 11 in a direction that, according to the deed, is parallel to the parcel's northern boundary. However, the northern boundary of the plaintiff's southern parcel is at such an angle that the southern boundary of the northern parcel cannot be parallel to its northern boundary. Therefore, the southern boundary of the plaintiff's northern parcel abuts a portion of the northern boundary of the plaintiff's southern parcel. Route 11 forms the eastern boundary of the plaintiffs' northern parcel. The deed does not provide a distance call for the eastern boundary; the parties did not obtain an actual measurement of that distance. However, because the northern and southern boundaries of the plaintiff's northern parcel are not parallel, the distance between the two corners on Route 11 (that is, the northeast

---

[4] The deed for this parcel running to the Morrows is the most recent included in the trial record. On defendant's exhibit 1, the owners are identified as Richard Kaelin and Kellie Michaud. (Relying on the deeds in evidence, the court refers to the parcel as "the Morrow parcel.") The parcel now owned by the Morrows or by Kaelin and Michaud is only a portion of the parcel as originally created in 1947; a portion of the original parcel that does not abut Route 11 was not included in the 1989 conveyance to the Morrows. That exclusion is not material to this case.

4

and southeast corners) is slightly less than the distance between the two interior corners (that is, the northwest and southwest corners).

The pending dispute between the plaintiffs and the defendants was triggered when the Pococks were in the process of improving the area that they believed was within the right-of-way that forms the southern boundary of the plaintiffs' southern parcel. The roadwork, which included the addition of gravel to improve (and, in some areas, create) the road, began in the interior area of the lot and progressed eastward toward the plaintiffs' residence and Route 11. That construction work led to an encounter with the water well that services the plaintiffs' residence. The plaintiffs obtained an injunction preventing the defendants from engaging in further work on the road pending resolution of the claims at bar. The plaintiffs claim that the right-of-way is more southerly, and thus further away from their residence and driveway, than the location of the roadwork. They argue that legal title, as reflected in the various deed descriptions, or, alternatively, adverse possession gives them title to the area claimed by the Pelletiers. They have named Carlton Bragg and the Pococks as defendants, because those parties have an easement over the right-of-way in order to gain access to their parcels.[5] (Bragg owns an area in the southwest section of the original lot 5, and the Pococks own a parcel located immediately west of the western boundary of lot 5. *See* defendant's exhibit 1.[6]) *See* defendants' exhibits 5, 6. The Pelletiers and Pococks have asserted a counterclaim seeking a declaratory judgment regarding the parties' rights respecting the parcels at issue in this case.

---

[5] None of the parties has included Richard and Barbara Hayes as parties to this action, even though the location of their triangular shaped parcel may be affected by this decree. None of the parties has raised an issue regarding joinder, and the court therefore does not address it here.

[6] The court understood James Pocock to testify that he owned much of the land that originally constituted lot 5. The trial record includes only one deed of conveyance to the Pococks. *See* defendants' exhibit 5. If the court reads that deed correctly, that deed conveys only a relatively small parcel (quantified as less than 1 acre in defendants' exhibit 1) located to the west of lot 5. Perhaps other deeds exist. Nonetheless, the extent of the Pococks' holdings is not material to a determination of the issues presented in this case.

The central question raised by the title claims is where the 36 foot wide right-of-way exists on the face of the earth. The location of the right-of-way is a function of the location of the Hayes property, which was the first parcel carved out of lot 5, because the southern edge of the right-of-way was described as the northern boundary of that pre-existing lot that now is owned by the Hayes'. Then, when the plaintiff's southern parcel was created, its southern boundary was identified as the northern edge of the right-of-way.

The location of a boundary on the face of the earth is a question of fact. *Hennessy v. Fairley*, 2002 ME 76, ¶ 21, --- A.2d. ---, ---. To determine that location from a deed description, the court must determine the intent of the parties to that deed. *Id.* If the facts extrinsic to the deed description are affected by a latent ambiguity, then a parcel's boundaries are located by reference to monuments, courses, distances and quantity, in that priority. *Id.* "Monuments" are "visible marks or indications left on natural or other objects indicating the lines and boundaries of a survey. In this sense the term includes not only posts, pillars, stone markers, cairns, and the like, but also fixed natural objects, blazed trees, and even a watercourse." BLACK'S LAW DICTIONARY 1159 (rev. 4th ed. 1969). A adjoining tract is a monument if it is identified as a boundary in the deed. *Snyder v. Haagen*, 679 A.2d 510, 514 (Me. 1996). ". . .[T]he physical disappearance of a monument terminates its status as a boundary marker unless its former location can be ascertained through extrinsic evidence." *Hennessy*, 2002 ME 76, ¶ 22, --- A.2d at --- (citation omitted).

The only monument identified in the 1914 deed that created the Hayes lot is a wire fence. That fence cannot be located. There are no other terms of description included in that deed that would establish the location of the parcel. Therefore, the location of the Hayes lot cannot be established on the basis of its deed description alone, and the location of the right-of-way cannot be determined with reference that description.

The next step of the analysis is to consider evidence of the location of the right-of-way. If physical evidence of the right-of-way exists, then the right-of-way would constitute a monument identified in the deed to the plaintiffs' southern parcel. The evidence demonstrates the location of a traveled way that is located westerly of the

6

plaintiffs' southern parcel. This evidence is found in two aerial photographs;[7] in the testimony of the defendants' expert that where the ground is otherwise low, the way is elevated; and in the testimony of several party-witnesses, who described ruts in the location where the right-of-way would be expected to exist. From this evidence of the location of a portion of the right-of-way, it must then be determined where that right-of-way exists as it passes immediately south of the plaintiff's southern parcel. This determination is made more difficult because there are no visible tracks or ruts on or adjacent to that parcel. However, the defendants' expert testified that with equipment that enhances the images in the aerial photographs, a travel way could be seen to extend to Route 11. That way is in the location depicted in his survey. *See* defendant's exhibit 1. Because of the expert's background and qualifications, the court gives weight to his testimony.

That testimony has support in corroborating evidence. Richard Hayes, who now owns the triangular lot, previously owned the plaintiff's southern parcel. Although he disputes the defendants' evidence regarding the nature and extent of the use of the right-of-way as a farm road, Hayes testified that Orrin Bates, who used parts of the interior sections of lot 5 for farming purposes, used the right-of-way to gain access to that interior land. Specifically, Hayes stated that he had to move his cars to allow Bates and his workers to get through. This evidence supports the defendants' argument that the right-of-way crosses over the driveway of the plaintiffs' southern parcel.

Based on their construction of the deeds to the outconveyances from lot 15, the plaintiffs argue that the southern boundary of their southern parcel is actually twelve feet more southerly than the defendants content. This argument is based on the observation that, according to the deed, the westerly boundary of the plaintiffs' northern property should be 236 feet. On the survey map prepared by the defendants' expert, however, he gives that line only 224 feet. If the southern boundary of the plaintiffs' northern parcel

---

[7] The defendants' expert witness used the aerial photographs to form an opinion regarding the location of the right-of-way. When forming that opinion, he used photographs taken in 1955. During the trial, he identified defendants' exhibits 18 and 19 as those photographs. This identification was mistaken because those two exhibits are photographs taken in 1984. The court does not find this confusion to be significant because, in part, there is no evidence of any material differences between the images of the 1955 and 1984 sets of photographs.

were located another twelve feet in a southerly direction and if the plaintiffs' southern parcel were then correspondingly shifted twelve feet to the south, then that would mean that the right-of-way would not encroach (or, at least, that it would not encroach as significantly) on the well and the plaintiffs' driveway.

This argument loses weight for two reasons. First, evidence of the historical use of the right-of-way indicates that it is located as the defendants contend, rather than 12 feet to the south. Second and more significantly, the court cannot place significant probative value on the distance calls set out in the deeds. Well-established Maine law attaches relatively inferior consequence to evidence of distance calls. *See, e.g., Hennessy*, 2002 ME 76, ¶ 21, --- A.2d at ---. That point is aptly demonstrated here. The most recent deed included in the trial record suggests that the entire frontage for Route 11 along the eastern boundary of the original lot 5 is 1,969 feet. *See* defendants' exhibit 5. All but one section of that road frontage can be quantified on the basis of the smaller parcels that derived from lot 5. From the northern end of lot 5, the Pelletiers own 575 feet of frontage, and the Morrows then own the next 100 feet. From the southern end of lot 5, there is road frontage of 420 feet owned by the Pelletiers; the Hayes' triangular parcel then has 594 feet of frontage (equivalent to 16 rods); then the right of way is 36 feet; and the plaintiffs' southern parcel has 99 feet of frontage. The sum of these sections of road frontage is 1,824. The only parcel not included in this calculation is the plaintiff's northern parcel. According to the deeds, there should be 236 feet of road frontage. However, only 125 feet remains.

This computation is not used to demonstrate that the eastern boundary of the plaintiff's northern parcel is only 125 feet. However, it shows that the distance calls on which the plaintiff relies are not as reliable as other considerations used to determine the location of boundaries.

From this evidence taken as a whole, the court concludes that the defendants have proven that the record boundaries of the right-of-way are as depicted on defendant's exhibit 1.

The plaintiffs then argue that even if they do not have an ownership interest in the land they claim as a matter of record title, they have acquired such an interest as a result of adverse possession. The defendants do not contest that part of the plaintiffs' adverse

8

possession claim that would give the plaintiffs an interest in the land where the plaintiffs' well is located.

"To successfully acquire title by adverse possession, the adverse possessor must prove by a preponderance of the evidence possession for a 20-year period that is actual, open, visible, notorious, hostile, under a claim of right, continuous and exclusive." *Loavenbruck v. Rohrback*, 2002 ME 73, ¶ 11, --- A.2d ---, ---. Here, the plaintiffs have failed to satisfy at least two elements of a claim for title by adverse possession. First, any use of the property that is supportive of such a claim has not extended for a 20-year period. In September 1990, the plaintiffs acquired their southern parcel from the United States government. *See* plaintiff's exhibit 1, deed dated September 13, 1990. Through a foreclosure process, the government had acquired title to the property from Hayes under a judgment dated July 28, 1987. *See id.,* deed dated October 20, 1988. In the absence of some express authorization (of which there is no evidence here), a party cannot acquire title against a governmental entity through adverse possession, and the time when such a governmental entity holds title cannot be included in the 20 year prescriptive period. *See Loavenbruck*, 2002 ME 73, ¶ 12, --- A.2d at ---. Therefore, the prescriptive period must have ended by July 1987. Hayes and Gary McNally testified about the use to which they put the disputed land. Hayes acquired the property in May 1968. *See* plaintiffs' exhibit 1, deed dated May 23, 1968. Therefore, on the basis of the period of Hayes' period of ownership, the prescriptive period could not have run prior to the government's acquisition of the property in 1987. However, Hayes also testified that he lived in the house for approximately one year prior to the date he acquired it. The court does not find that estimate to be sufficiently precise to establish a 20-year period, because that additional time would bring the period of occupancy to the margin of the prescriptive period.

Second, the plaintiffs have not established that their use of the disputed property was exclusive. To the contrary, the evidence demonstrates that the right-of-way which crosses over the property claimed by the plaintiffs was used routinely for access into the interior portions of lot 15, either for farming or recreational purposes.

9

Therefore, the plaintiffs have not demonstrated title by adverse possession to the disputed premises, except for the area associated with the water well and the connection between the well and the residence.[8]

The entry shall be:

For the foregoing reasons, the court concludes that the southern boundary of the property owned by the plaintiffs, described more fully in a deed recorded at book 4749 page 193 of the Penobscot County Registry of Deeds, is as depicted in the survey admitted into evidence as defendant's exhibit 1. That exhibit is incorporated by reference herein.

Further, the plaintiffs have title by adverse possession to the land, located within the right-of-way owned in fee by one or more of the defendants, where their water well is sited and where that well is connected to the plaintiffs' residence.

No costs of court are awarded to any party.


Dated: May 10, 2002

_____
Justice, Maine Superior Court

---

[8] The court recognizes that the result of this analysis may cause some hardship to the plaintiffs. For example, the porch to the plaintiffs' residence (although not the residence proper) is situated within that right-of-way. However, when the plaintiffs' purchased the property in 1990, they elected to forego a survey that might have revealed the title and boundary problems revealed by this case.